# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| GCA SERVICES GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PARCOU, LLC, SOUTHERN | ) | No. 2:16-cv-02251-SHL-cgc |
| MAINTENANCE SYSTEMS, LLC, JERRY | ) | |
| PARKER, MARK COULTER, COLLINS | ) | |
| ONYANDO and CHRISTOPHER | ) | |
| PEARSALL, | ) | |
| | ) | |
| Defendants. | ) | |

# ORDER GRANTING IN PART AND DENYING IN PART
# CROSS-MOTIONS FOR SUMMARY JUDGMENT

GCA Services Group, Inc. ("Plaintiff" or "GCA") once employed Jerry Parker, Mark Coulter, Collins Onyando, and Christopher Pearsall (the individual "Defendants"). This dispute arose when the individual Defendants left GCA and began working for other employers in the "outsourced facilities management" industry, allegedly violating their employment agreements with GCA, statutory provisions, tort law or all of the above. Before the Court are cross-motions for summary judgment: Defendant ParCou, LLC's Motion for Summary Judgment (ECF No. 148), filed April 28, 2017; Defendants Parker and Coulter's Motion for Summary Judgment (ECF No. 149), filed April 28, 2017; and Plaintiff's Motion for Partial Summary Judgment against Defendants Jerry Parker, Mark Coulter, Christopher Pearsall, and Collins Onyando (ECF No. 152), filed May 1, 2017. Plaintiff responded to Defendants' Motions for Summary Judgment (ECF No. 155) on May 26, 2017, and Defendants Parker and Coulter responded to

Plaintiff's Motion for Summary Judgment (ECF No. 158) on May 30, 2017.  Defendants Parker,

Coulter, and ParCou replied in support of their Motions (ECF No. 160) on June 9, 2017, and

Plaintiff replied in support of its Motion (ECF No. 162) on June 13, 2017.  The motions were

argued before the Court on July 27, 2017.  Defendant Pearsall also responded to Plaintiff's

Motion in a letter to the Court (ECF No. 173) dated August 11, 2017.[1]  Plaintiff submitted a

reply to Pearsall's letter (ECF No. 174) on August 18, 2017.

Plaintiff originally alleged nineteen claims against eleven corporate and individual

Defendants.[2]  Plaintiff's remaining claims include: Count I, breach of contract against

Christopher Pearsall; Count III, breach of contract against Collins Onyando; Count IV, breach of

contract against Jerry Parker; Count IX, breach of contract against Mark Coulter; Count X,

misappropriation of trade secrets under Tennessee common law against Pearsall, Onyando,

Parker, and Coulter; Count XI, violation of the Tennessee's Uniform Trade Secrets Act against

Pearsall, Onyando, Parker, and Coulter; Count XII, intentional interference with business

relationships against Parker; Count XIII, intentional interference with business relationships

against Pearsall; Count XIV, intentional inducement of breach of contract against Parker,

---

[1]     As will be discussed in more detail, <u>infra</u>, Onyando and Pearsall have not thoroughly responded to GCA's Motion for Summary Judgment, nor have they responded to Plaintiff's Statement of Undisputed Material Facts.

[2]     Some Defendants and their respective claims were dismissed prior to these Motions.   Plaintiff voluntarily dismissed its claims against Jerry Tigner on October 24, 2016.  (ECF No. 98.)  Judge S. Thomas Anderson granted Plaintiff's Motion to Dismiss David Coulter and Enzo Dickens on November 28, 2016, (ECF No. 106), Plaintiff's Motion to Dismiss Jonathan Lewis on January 30, 2017, (ECF No. 115), and Plaintiff's Motion to Dismiss LaKendrell Parker on March 20, 2017.  (ECF No. 132.)  Therefore, Counts II, V, VI, VII, VIII, XVI and XIX, which name only the dismissed Defendants, are no longer active claims, and Parker, Coulter, Onyando, and Pearsall are the only remaining individual defendants.

This Court granted Plaintiff's Motion for Entry of Default against Southern Maintenance Systems ("SMS") on August 8, 2017.  (ECF No. 171).  Count XIII (as to SMS), as well as Count XV (SMS's intentional inducement of Pearsall and Onyando's breaches of contract), are also therefore no longer active claims.

Coulter, and ParCou; Count XVII, fraud against Parker and Coulter; and Count XVIII, breach of fiduciary duty and/or loyalty against Parker and Coulter.

As an initial matter, Plaintiff admits that there is no genuine issue of material fact as to Count X and Count XII. For reasons explained more fully below, judgment as a matter of law for Defendants is appropriate. Therefore, the Court **GRANTS** summary judgment to Parker, Coulter, Onyando, and Pearsall on Count X[3] and to Parker on Count XII.[4] Those claims are **DISMISSED WITH PREJUDICE**.

The remaining claims present several discrete questions of law. Resolution of these issues turns on:

1. Whether actual damages must be suffered to recover on a restrictive covenant breach of contract claim;

2. Whether actual use of protected information and proof of damages are required to establish a claim under the Tennessee Uniform Trade Secrets Act;

3. Whether attorney's fees in a voluntarily dismissed action against a third-party are sufficient to establish damages in an intentional inducement of breach of contract claim;

4. What the appropriate measure of damages is when an employee engages in fraud; and

5. Whether Defendants' actions amounted to a breach of loyalty as a matter of law.

After consideration of each of these questions and for reasons more fully explained below, the Court **DENIES** Plaintiff's motion for summary judgment with respect to one breach of contract (I) claim; **GRANTS** Plaintiff's motion for summary judgment **IN PART** with respect

---

[3]     Although only Parker and Coulter moved for summary judgment on this Count, the same logic is equally applicable to Onyando and Pearsall. See infra at Part IV.

[4]     For similar reasons, the Court also intends to dismiss Count XIII against Pearsall, unless briefing regarding record support for this claim is submitted before trial. See infra at n.13.

to its remaining breach of contract (III, IV, IX) claims;[5] **DENIES** Defendants' motion for summary judgment with respect to Plaintiff's Tennessee Uniform Trade Secrets Act (XI) claim; **GRANTS** Defendants' motion with respect to Plaintiff's intentional inducement of breach of contract claim (XIV);[6] and **DENIES** summary judgment to both Plaintiff and Defendants on the fraud (XVII) and breach of loyalty (XVIII) claims.

## BACKGROUND

The individual Defendants were previously employed by GCA.  Coulter began working for GCA in 2008.  (ECF No. 159 at ¶ 12.)  At that time, Coulter was required to sign an employment agreement that included, among other things, a "non-interference"[7] provision.  (Id. at ¶ 19.)  Parker and Pearsall were hired in 2010 (Id. at ¶¶ 10, 14), and Onyando's relevant employment period began in 2011.  (Id. at ¶ 16.)  Parker, Pearsall and Onyando were required to sign employment agreements which included a "non-competition"[8] provision in addition to non-disclosure and non-interference provisions.  (Id. at ¶¶ 18, 20, 21.)

In 2013, Parker and Coulter began discussing forming their own business, to be called "ParCou."  (Id. at ¶¶ 34–35.)  By the middle of September 2013, Parker and Coulter had ordered business cards, contacted a vendor about t-shirts, and started using a "par-cou.com" email address.  (Id. at ¶ 37.)  By August 2014, Parker and Coulter had begun work on a website, filed

---

[5]     The Court also **DENIES** Defendants' cross-motion as to these claims.

[6]     Therefore, no claims remain against Defendant ParCou.

[7]     Briefly, the "non-interference" provision prohibited an employee from approaching other employees about leaving GCA and from soliciting or accepting employment from GCA's former or once-prospective clients during employment and for a period of two years following employment with GCA. See infra at II.A.3.

[8]     Briefly, the "non-competition" provision prohibited an employee from accepting employment with "any business . . . involved in the provision or management of facilities management services" for a period of two years following employment with GCA.  See infra at II.A.3.

ParCou's articles of organization with the Tennessee Secretary of State, and opened a bank account.  (Id. at ¶¶ 38–40.)  By September 2014, they had secured an Employer Identification Number.  (Id. at ¶ 48.)

According to GCA, throughout this time, Parker and Coulter benefitted from GCA's human and capital resources.  Jonathan Lewis, a GCA employee, communicated on ParCou's behalf with a marketing firm and a commercial printer using his GCA email (Id. at ¶¶ 44, 45), and another employee may have assisted ParCou register as a "vendor for Memphis Light, Gas and Water and the Tennessee Valley Authority" in early 2015, using a GCA scanner.  (Id. at ¶¶ 55, 56.)  GCA also alleges that Lewis misappropriated "approximately 100 pages of documents that it contends was [sic] confidential and proprietary trade secret information . . . by sending them to his personal email accounts."  (ECF No. 156 at ¶ 27.)  Circumstantial evidence—including Lewis's appearance on ParCou's 2015 payroll—indicates that Lewis may have acted on behalf of ParCou.  (Id. at ¶¶ 28, 37 (Plaintiff's response); see also ECF No. 156-8 at 13–15.)

Some time in 2014, a GCA employee found a ParCou business card in its offices, and Plaintiff conducted an "investigation" into whether ParCou was "in business" or "competing" with GCA.  (ECF No. 156 at ¶ 38.)  Parker and Coulter represented that Parcou was neither in business nor competing with GCA.  (Id.)  Parker and Coulter later resigned from GCA in April 2015.  (Id. at ¶ 58.)[9]  In June 2015, ParCou provided services to the Tennessee Valley Authority for a two-month period.  (Id. at ¶ 57.)  In August 2015, ParCou began providing services to

---

[9]    Parker appears to contend that he resigned earlier but continued working for GCA.  This dispute of fact, however, does not appear to impact the current issues before the Court.

Diersen Charities.  (<u>Id.</u> at ¶ 50.)  By at least March 2016, ParCou had begun bidding against

GCA to win maintenance contracts.  (<u>Id.</u> at ¶¶ 90, 92.)

Onyando and Pearsall's employment with GCA ended in May 2015.  (ECF No. 159 at

¶¶ 63, 67.)  The two began working for Southern Management Services ("SMS") shortly

thereafter.  (<u>Id.</u> at ¶¶ 79, 80.)  As a part of their work for SMS, Onyando and Pearsall had many

of the same responsibilities (<u>id.</u>) and were apparently involved in bidding on contracts for which

GCA also competed (<u>id.</u> at ¶¶ 95, 96, 103, 104), including a February 2016 bid for the business

of the Shelby County Schools (<u>see id.</u> at ¶¶ 88, 90), one of GCA's former clients (<u>id.</u> at ¶ 86), in

partnership with ParCou.  (<u>Id.</u> at ¶ 85.)  Onyando and Pearsall also appear to have featured in

SMS's proposal to Cheatham County Schools (<u>id.</u> at ¶ 101), a contract which GCA subsequently

lost to SMS.  (<u>Id.</u> at ¶ 102.)  Plaintiff alleges that, at various times, the individual Defendants also

solicited Millington Municipal Schools and Gibson County Schools.  (<u>Id.</u> at ¶¶ 94–100, 103–04.)

Plaintiff sued Parker, Coulter, Onyando and Pearsall for breach of their employment

contracts (Counts I, III, IV and IX, ECF No. 1 at 8–14); Parker, Coulter, Onyando and Pearsall

for misappropriation of trade secrets under Tennessee common law, as well as under the

Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701 (Counts X and XI, <u>id.</u> at

14–17); Parker for intentionally interfering with its business relationship with Shelby County

Schools (Count XII, <u>id.</u> at 17); Pearsall for intentionally interfering with its business relationship

with Williamson County Schools (Count XIII, <u>id.</u> at 17–18); Parker, Coulter and ParCou for

intentional inducement of Lewis's breach of contract (Count XIV, <u>id.</u> 18–19); Parker and Coulter

for fraud (Count XVII, <u>id.</u> at 20); and Parker and Coulter for breach of their fiduciary duty and/or

loyalty (Count XVIII, <u>id.</u> at 21).[10]  Plaintiff seeks compensatory damages to be determined at

---

[10]      Various claims have been dismissed prior to this point.  <u>See</u> <u>supra</u> at n.1.

trial; exemplary damages as allowed under the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-45-1704, for "willful and malicious" misappropriation; "disgorgement of ill-gotten gains or profits," as provided in GCA's standard employment agreement; attorney's fees as allowed by Tenn. Code Ann. § 47-45-1705; and permanent injunctions prohibiting further violations of the individual Defendants' employment agreements and restraining Defendants' ability to make use of the trade secrets allegedly misappropriated from GCA.

## ANALYSIS

### I.     Standard of Review and Choice of Law

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court is to view facts in the record and to draw reasonable inferences from those facts in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once a properly supported motion for summary judgment has been made, the party opposing summary judgment must show that there is a genuine dispute of material fact by pointing to evidence in the record or must argue that the moving party is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). The opposing party "cannot rest solely on the allegations made in [his] pleadings." Everson v. Leis, 556 F.3d 484, 496 (6th Cir. 2009) (quoting Skousen v. Brighton High Sch., 305 F.3d 520, 527 (6th Cir. 2002)) (alteration in original). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

While the Court views all evidence and factual inferences in the light most favorable to the non-moving party, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Id.</u> at 247–48 (emphasis in original). The Court's role is not to weigh evidence or assess witness credibility, but simply to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Kroll v. White Lake Ambulance Auth.</u>, 763 F.3d 619, 623 (6th Cir. 2014) (quoting <u>Anderson</u>, 477 U.S. at 251–52).

While Defendants Parker, Coulter, and ParCou have responded to Plaintiff's Motion for Summary Judgment (and filed their own), Defendants Pearsall and Onyando have failed to do the same. Normally, a party opposing a motion for summary judgment must file a response to the arguments and the statement of undisputed material facts filed by the movant, and must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R .Civ. P. 56(c). Both Pearsall and Onyando—who represent themselves in this matter—were advised by the Court at the hearing held on July 27, 2017, of the necessity of responding and given until August 11, 2017, to do so. <u>See</u> Fed. R. Civ. P. 56(e). Pearsall responded on that date by letter to the Court (ECF No. 173). While the letter disputes facts presented as undisputed by Plaintiff, the unsworn statements contained therein constitute "mere allegations" that cannot support his opposition to Plaintiff's Motion for Summary Judgment. <u>See, e.g.</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Llyod v. Midland Funding, LLC</u>, 639 F. App'x 301, 305 (6th Cir. 2016) (citing <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 582 (6th Cir. 1992)). As of this date, Onyando has failed to respond entirely.

However, "summary judgment cannot be granted by default" in either case. Fed. R. Civ. P. 56(e). Before granting summary judgment against either Defendant, then, the Court will seek

first to "reassure itself by some examination of the record" that summary judgment is appropriate.  Id.

As to the question of choice of law, with respect to Plaintiff's breach of contract claims, Ohio law governs.  Generally, Tennessee follows the rule of lex loci contractus, meaning that "a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent" such as a valid choice-of-law provision contained in the parties' contract.  Se. Texas Inns, Inc. v. Prime Hosp. Corp., 462 F.3d 666, 672 n.8 (6th Cir. 2006); see also Williams v. Irby, No. 13-cv-2481-STA-cgc, 2014 WL 859228, at *3 (W.D. Tenn. 2014) ("In cases where the parties' contract contains a choice-of-law provision, the Court will honor the parties' choice to apply the laws of another jurisdiction.").  A valid choice-of-law provision "must be executed in good faith, . . . bear a material connection to the transaction, . . . be reasonable and not a sham, and . . . must not be contrary to the fundamental policy of a state having a materially greater interest and whose law would otherwise govern."  Se. Texas Inns, Inc., 462 F.3d at 672 n.8 (internal citations omitted).

The contracts in dispute include choice of law provisions that call for the application of Ohio law (Parker's Employment Agreement, ECF No. 152-6 at 82; Coulter's Employment Agreement, ECF No. 152-8 at 49; Onyando's Employment Agreement, ECF No. 152-10 at 45; and Pearsall's Employment Agreement, ECF No. 152-3 at 10), and no party appears to dispute the validity of this provision.  (See ECF No. 149-1 at 6; ECF No. 152-1 at *14.)

With respect to Plaintiff's tort claims, Tennessee law governs.  Tennessee follows the "most significant relationship" approach, which provides that "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation."  See Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992).  The injuries alleged in

Plaintiff's Complaint occurred in Tennessee, and no party argues that any other state has a more significant interest in the outcome of this litigation.  (See ECF No. 148-1 at 6; ECF No. 149-1 at 6; ECF No. 152-1 at *12.)

## II.     Summary Judgment Arguments

At the outset, there is no genuine dispute of material fact with respect to Plaintiff's common law misappropriation claim (Count X) or with respect to its intentional interference with its business relationship with Shelby County Schools claim (Count XII) and judgment for Defendants is appropriate as a matter of law.  As Defendants point out, the misappropriation claim, brought under the common law of Tennessee, is necessarily preempted by the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701 to -1709, which "displaces conflicting tort, restitutionary, and other law of [Tennessee] providing civil remedies for misappropriation of a trade secret."  Id. at § 1708; (ECF No. 149 at 15–16).  Plaintiff failed to address this argument in their Response (ECF No. 155; see also ECF No. 160 at 2), and agreed at the July 27, 2017, motion hearing that TUTSA preempts Count X of the Complaint.  Despite their not having moved for summary judgment, the same logic is equally applicable to Defendants Onyando and Pearsall.  Accordingly, the Court **GRANTS** Defendants' motion for summary judgment with respect to Count X, and that claim is **DISMISSED WITH PREJUDICE** as to all remaining Defendants.

As to Count XII, Plaintiff alleged in the original complaint that Parker[11] interfered with GCA's relationship with Shelby County Schools by "defaming GCA and misappropriating GCA's confidential and proprietary trade secret information."  (ECF No. 1 at 17.)  To the extent that Claim XII is based on misappropriation, it is also be preempted by TUTSA.  See supra.

---

[11]     Along with five other defendants once party to the Complaint.  See supra at n.2.

Defamation, therefore, is the only remaining "improper means" alleged by which Parker could have interfered with GCA's business relationship. Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002). However, Plaintiff later agreed that it had not alleged defamation on Parker's part. (ECF No. 156 at ¶ 32.) Plaintiff further agreed at the hearing that no genuine material dispute exists as to this claim. Given that there is no factual dispute that Plaintiff has not alleged defamation by Parker, there is no viable legal claim in this Count. Therefore, the Court **GRANTS** Defendants' motion for summary judgment with respect to Count XII, which is **DISMISSED WITH PREJUDICE**.[12]

## A. Breach of Contract Claims (Counts I, III, IV and IX)

To establish a breach of contract claim under Ohio law, "plaintiff must establish: (1) the existence of a binding contract; (2) plaintiff's performance; (3) defendant's breach; and (4) damage or loss as a result of such breach." MP TotalCare Services, Inc. v. Mattimoe, 648

---

[12]    For similar reasons, the Court does not believe that any genuine issue of material fact exists with respect to Plaintiff's claim against Pearsall for interfering with its business relationship with Williamson County Schools by "defaming GCA and misappropriating GCA's confidential and proprietary information" (Count XIII). (ECF No. 1 at 18.) The Court also believes that judgment for Pearsall is appropriate as a matter of law. To the extent that Count XIII is based on misappropriation, it is also preempted by TUTSA. See supra. Again, this leaves defamation as the only "improper means" alleged by which Pearsall could have interfered with GCA's business relationship. See Trau-Med, 71 S.W.3d at 701. But Plaintiff's Complaint describes only allegedly-defamatory statements made by David (not Mark) Coulter (ECF No. 1 at ¶¶ 23, 111), and perhaps by Jerry Parker. (Id. at ¶ 91.)

Although Pearsall did not argue that he is entitled to judgment on this claim, the Court raises this issue now. After reviewing the excerpts of Pearsall's deposition testimony provided to the Court by Plaintiff, the Court observes that Plaintiff does not appear to have questioned Pearsall about any alleged defamatory statements. The Court is therefore unaware of any evidence suggesting that Pearsall defamed GCA, see Fed. R. Civ. P. 56(c), and is inclined to dismiss Count XIII of the Plaintiff's Complaint. A district court should only dismiss a claim sua sponte, however, after the court "gives notice of its intent to do so," and "plaintiffs have an opportunity to show why dismissal is not warranted." Rondigo, L.L.C. v. Township of Richmond, Mich., 522 Fed. App'x 283, 286 (6th Cir. 2013) (citing Wagenknecht v. United States, 533 F.3d 412, 417 (6th Cir. 2008)). Plaintiff should therefore consider itself "on notice." The Court intends to dismiss Count XIII unless briefing regarding evidentiary support for this claim is submitted by October 25, 2017, the first day of the trial of this matter.

F. Supp. 2d 956, 962 (N.D. Ohio 2009) (citing, inter alia, Doner v. Snapp, 98 Ohio App. 3d 597, 600 (Ohio Ct. App. 1994)).

Defendants argue in their motion that they are entitled to summary judgment on Plaintiff's breach of contract claims because their employment contracts with GCA were not valid; Plaintiff did not perform under the Parker employment agreement; and "Plaintiff has failed to point to any damages it has sustained." (ECF No. 149-1 at 7–15.) In its cross-motion for partial summary judgment, Plaintiff argues that it is entitled to summary judgment on these claims because Parker, Coulter, Onyando, and Pearsall signed valid employment agreements with GCA; Plaintiff performed; Defendants breached the non-interference and non-competition provisions of their respective employment agreements; and the agreements themselves provide for damages in the event of breach. (ECF No. 152-1 at *18–28.)

### 1. Existence of a Binding Contract

First, Defendants Parker and Coulter argue that the restrictive covenants in their employment contracts with GCA render those contracts void. To the extent this argument is meant to defeat all contracts with restrictive covenants, however, as bargained-for consideration, restrictive covenants—such as the non-interference and non-competition provisions at issue here—are not per se unreasonable. Under Ohio law, restrictive covenants are enforceable "to the extent necessary to protect the employer's legitimate interests," and are considered reasonable when they are "no greater than is required for the protection of the employer," do not "impose undue hardship on the employee," and are not "injurious to the public." Raimonde v. Van Vlerah, 325 N.E. 2d 544, 547 (Ohio 1975); see also FirstEnergy Solutions Corp. v. Flerick, 521 Fed. App'x 521, 525 (6th Cir. 2013).

Defendants' primary argument seems to be that these "restrictive covenants are much greater than is necessary to protect Plaintiff's interests," because they are "two-year, worldwide

noncompetition agreements that prohibit Parker and Coulter from working in five different industries." (ECF No. 149-1 at 9–11.) But restrictive covenants must be considered against the backdrop of the relevant industry. A two-year restrictive covenant is not necessarily "greater than necessary" in an industry that is highly competitive. See, e.g., Life Line Screening of Am., Ltd. v. Calger, 881 N.E.2d 932, 942 n.1 (Ohio Ct. Com. Pl. 2006) (collecting cases).[13] Nor is an expansive geographic limitation inappropriate if it is reasonably related to the geographic scope of the employer's business. See, e.g., Procter & Gamble Co. v. Stoneham, 747 N.E.2d 268, 277, 280 (Ohio Ct. App. 2000). The Court is also not convinced that the restrictive covenants "prohibit Parker and Coulter from working in five different industries." (ECF No. 149-1 at 9) (emphasis added). As Plaintiff points out, its interest is not in preventing Parker, Coulter, Onyando, and Pearsall from performing "janitorial, housekeeping, plant operations and maintenance, temporary staffing or security services." (ECF No. 155 at *8.) Rather, its interest is in preventing employees from using the skills they have gained at GCA against GCA in the "outsourced facilities management" industry.[14]

Even if the Court was persuaded that the restrictive covenants in the GCA agreements were unreasonable, the most appropriate course of action would be to modify the covenants to render them reasonable. See Raimonde, 325 N.E.2d at 547 ("Courts are empowered to modify or amend employment agreements" to achieve just results.). While the Court is not required to modify an agreement, see LCP Holding Co. v. Taylor, 817 N.E.2d 439, 446 (Ohio Ct. App. 2004), Ohio courts routinely do so. See, e.g., Rogers v. Runfola & Assoc., Inc., 565 N.E.2d 540,

---

[13]     Moreover, a "failure to provide specific justification for a covenant's length [does not] automatically mean[ ] that the covenant is unreasonable." Chicago Title Ins. Corp. v. Magnuson, 487 F.3d 985, 992 (6th Cir. 2007) (applying Ohio law).

[14]     ". . . to compete for the contract to provide the services, price the contract, manage the expenses, and maintain the relationship with customer over time." (Id. (emphasis omitted).)

544 (Ohio 1991); <u>Murray v. Accoutning Ctr. & Tax Servs.</u>, 898 N.E.2d 89, 94 (Ohio Ct. App. 2008); <u>MP TotalCare</u>, 648 F. Supp. 2d at 964; <u>Holzer Clinic, Inc. v. Simpson</u>, No. 97CA9, 1998 WL 241887, *6 (Ohio Ct. App. Apr. 28, 1998); <u>Bruner-Cox v. Dimengo</u>, No. 17732, 1997 WL 72095, *4 (Ohio Ct. App. Feb. 12, 1997); <u>Mako v. Collier Constr. Co.</u>, No. 36563, 1977 WL 201603, *6 (Ohio Ct. App. Nov. 23, 1977).  As Ohio courts have held, "the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." <u>FirstEnergy</u>, 521 F. App'x at 529 (citing <u>Nat'l Interstate Ins. Co. v. Perro</u>, 934 F. Supp. 883, 891 (N.D. Ohio 1996)).  Reasonable modifications in this case, such as limiting the number of "industries" to which the restrictive covenants are applicable or limiting their geographic scope, would serve the public interest and would also result in a valid contract that Defendants are just as likely to have violated.

Pearsall disputes that he signed the agreement produced by Plaintiff,[15] but points to no evidence in the record to support his assertion.[16]  The evidence offered by the Plaintiff, however, is not "overwhelming."  (<u>See</u> ECF No. 174 at 3.)  Plaintiff has produced the alleged employment

---

[15]     Parker and Onyando appear ambivalent about whether they signed their respective agreements (<u>see</u> ECF No. 152-6 at 30–31; ECF No. 152-10 at 8–11), but neither specifically denies signing it. Coulter agrees that his wife signed his agreement, with his authorization.  (ECF. No 152-8 at 38–40.)

[16]     Although a district court is not required to search the record to evaluate the mere unsupported allegations of a pro se litigant, the Court is also not prohibited from doing so.  Fed. R. Civ. P. 56(e) ("The court . . . may consider other materials in the record.")  And while status as a pro se litigant does not alter that litigant's duty in the first instance to "identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial," <u>Amini v. Oberlin College</u>, 440 F.3d 350, 357 (6th Cir. 2006), the Court's prerogative to consider other materials in the record is particularly useful when the Court "seek[s] to reassure itself . . . before granting summary judgment against a pro se litigant"—as it does here. Fed. R. Civ. P. 56(e).

Here, Pearsall's letter functions only as an additional pleading, <u>see</u> <u>Zainalian v. Memphis Bd. Of Educ.</u>, 3 Fed. App'x 429, 431 (6th Cir. 2001), that makes it evident that Pearsall disputes Plaintiff's assertions.  That the dispute is "genuine" and "material" may not be supported by the unsworn assertions in Pearsall's letter, but evidence that this dispute is both genuine and material is found elsewhere in the record.

agreement (ECF No. 152-3), as well as the sworn statement of its Vice President of Human Resources, who testifies that "[i]t is GCA's usual practice . . . to have all managers sign an employment agreement," and that the agreement produced is the one "maintained by GCA in Mr. Pearsall's personnel file."  (ECF No. 152-3 at 3–4.)  Absent from the Pearsall deposition excerpts submitted by Plaintiff, however, are questions regarding whether Pearsall did in fact sign the agreement. (See ECF No. 152-9.)  Plaintiff relies, therefore, on "usual business practices," not testimony specific to Pearsall's signing of the agreement. And although Pearsall has failed to point to evidence in the record that supports his assertion, the Court observes that both Parker and Onyando testified during their depositions that their experience with GCA left them skeptical of GCA's recordkeeping. (See ECF No. 152-6 at 30–31; ECF No. 152-10 at 8–11.) Finally, of particular note is the fact that Pearsall is asserting a negative, for which there is typically little evidence to point to as support.

Despite Plaintiff's claim to the contrary, the Court finds that there is a genuine dispute of material fact on this point.  Therefore, the question of whether there is a valid agreement between Pearsall and GCA must be submitted to a jury.  Summary judgment for the Plaintiff with respect to its claim against Pearsall, therefore, is inappropriate, and is **DENIED**.

### 2.  Plaintiff's Performance

Defendant Parker also argues that he is entitled to summary judgment on the breach of contract claim because Plaintiff breached first.  "Under Ohio law, a non-breaching party to a contract is excused from complying with [the] conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract."  Waste Mgmt., Inc. v. Rice Danis Indus. Corp., 257 F. Supp. 2d 1076, 1084 (S.D. Ohio 2003).  It is essential, however, that the breach be material.  Id. at 1085 (citing Restatement (Second) of Contracts (1981), § 241).  Parker argues that unilateral changes to a compensation agreement

constitute material breaches.  Brakefire, Inc. v. Overbeck, 878 N.E.2d 84, 102 (Ohio Ct. Com. Pl.

2007).  Parker claims that his employment agreement with GCA included a compensation

agreement, and that Plaintiff unilaterally changed that agreement.  "Plaintiff hired Parker as an

account manager and agreed to pay Parker a salary of $42,000.00 per year, paid in bi-weekly

installments of $1,615.39.  In actuality, Plaintiff paid Parker $40,000, or approximately

$1,538.00 bi-weekly."  (ECF No. 149-1 at 15.)

Setting aside whether the compensation provision in fact constituted a part of the

employment agreement, any breach by GCA was immaterial.  Records produced by Plaintiff

reflect that Parker was paid around $1,538 for each of eleven pay periods spanning from April to

July 2010 (ECF No. 156-2 at 3–4), which provides some support for Parker's argument about the

amount of his compensation.  But, as Parker acknowledges, Parker was quickly promoted.  (ECF

No. 160 at 6; ECF 160-1 at 4.)  Thereafter, records produced by Plaintiff indicate that his pay

increased to about $2,000 for each of twenty-one pay periods spanning from July to October

2010 (ECF No. 156-2 at 4–6), and to what looks like an average of $2,500 per period for the

remainder of the year.  (Id. at 6–9.)  Parker also received a year-end bonus of $5,000 (id. at 9),

bringing Parker's gross earnings in 2010 to $44,866.70 (id. at 11)—almost $3,000 more than

Parker contends he was originally promised for the year.  What's more, Parker's pay continued

to increase in 2011.  That year, he received a $6,500 year-end bonus, and was paid $74,403.56

by GCA.  (Id. at 25.)

Parker has not disputed the validity of these records.  Rather, Parker argues that "[b]y the

time of the promotion, . . . Plantiff had already breached the Parker Agreement."  (ECF 160 at 6.)

But given the figures presented by Plaintiff, the Court cannot find that this breach was material.

Parker is unable to show that he has been deprived of any benefit he reasonably expected, see

Brakefire, 878 N.E.2d at 101–02, and is therefore not entitled to escape his obligations under the employment agreement.  Parker is not entitled to judgment as a matter of law based on this argument.

### 3.  Defendants' Breaches

In support of its Motion, Plaintiff points to several instances in which the individual Defendants allegedly violated either the non-competition or the non-interference provisions of their employment agreements.

**Non-competition.**  Parker, Onyando, and Pearsall's non-competition provisions provided, in pertinent part, that

> for a period of two years [after the term of this Agreement] Employee shall not, directly or indirectly (whether for compensation or otherwise), engage in (as a principal, shareholder, partner, director, officer, agent, employee, consultant or otherwise), be financially interested in, or in any other capacity own, manage, operate, join, [or] control . . . any business that is involved in [outsourced facilities management].

(ECF No. 152-6 at 79; ECF No. 152-10 at 42; ECF No. 152-3 at 2.)

It is undisputed that Parker "owns" ParCou.  (ECF No. 159 at ¶ 68.)  While Parker disputes whether ParCou is "in the financial position to compete with Plaintiff" (id. at ¶ 73), it is undisputed that "ParCou provides facilities services to customers in the commercial and education sectors" (id. at ¶ 69) and that ParCou has bid against GCA to win facilities management contracts.  (Id. at ¶¶ 85, 90, 92.)

It is also undisputed that Pearsall began working as an employee for SMS in July 2015 (ECF No. 159 at ¶ 79; see also ECF No. 152-9 at 12) and that Onyando began working as an employee for SMS in January 2016.  (ECF No. 159 at ¶ 80; see also ECF No. 152-10 at 19–23.)  SMS also bids against GCA to win facilities management contracts (ECF No. 159 at ¶¶ 85, 87, 90, 94–104), and Onyando and Pearsall had

substantially similar job duties at SMS.  (Id. at ¶¶ 79, 80.)  Given these facts, there is no

genuine dispute as to whether Parker and Onyando breached the noncompetition

provisions in their employment agreements.  As for Pearsall, if a jury finds that he signed

his employment agreement (see supra at Part III.A.1), there is no genuine dispute that he

breached that contract.

     **Non-interference.**  All of the individual Defendants' agreements also included a non-

interference provision, which provided, in pertinent part, that

> during Employee's employment by GCA and for a period of two [ ] years after
> Employee's employment with GCA ceases for whatever reason, Employee agrees
> that he/she shall not . . .
>
> > directly or indirectly, approach or solicit for business . . . any person or entity
> > that:
> >
> > > (i)  has been a customer of [ ] GCA . . . within the one-year period ending
> > > on the termination of Employee's employment; or
> > >
> > > (ii) to whom Employee solicited, established business with, or provided
> > > services to or for during his or her employment with GCA[.]

(ECF No. 152-6 at 80; ECF No. 152-8 at 46–47; ECF No. 152-10 at 42; ECF No. 152-3 at 8.)

Plaintiff contends that the individual Defendants breached their respective non-interference

provisions by soliciting business from Shelby County Schools, Millington Municipal Schools,

Cheatham County Schools, and Gibson County Schools.  (ECF No. 152-1 at *19–20.)

     In connection with Shelby County Schools (SCS), that Defendants solicited SCS for

business is undisputed.  (ECF No. 159 at ¶¶ 85–90.)  Plaintiff also asserts that GCA serviced

SCS before and after Parker, Coulter, Onyando, and Pearsall left GCA.  (ECF No. 152-1 at 20.)

This assertion is not sufficient, however, to establish that SCS was "a customer of [ ] GCA . . .

within the one-year period" prior to Parker, Coulter, Onyando, and Pearsall's departures from

GCA.  To establish a breach under the first subsection, GCA must establish that SCS was a client

between April 2014 and April 2015 for Parker and Coulter, and between May 2014 and May 2015 for Onyando and Pearsall.  (See ECF No. 159 at ¶¶ 58, 63, 67.)

With regard to the Millington Municipal Schools, Plaintiff asserts that Coulter and Onyando breached their non-interference provisions "by soliciting the Millington Municipal Schools on SMS's behalf in 2016," within the two-year non-interference period following their departures from GCA.  (ECF No. 152-1 at 20; see also ECF No. 159 at ¶¶ 94, 95, 96.)  According to Plaintiff, "Coulter managed the Millington account for GCA," in breach of the second subsection, "and Millington was still a GCA customer as of 2015—within a year of Coulter and Onyando leaving GCA," in breach of the first subsection.  (ECF No. 152-1 at 20; see also ECF No. 159 at ¶¶ 32, 100.)  These facts are undisputed.

Plaintiff also contends that Onyando and Pearsall's being "featured prominently" in SMS's bid for Cheatham County Schools violated Onyando and Pearsall's non-interference provisions.  (ECF No. 152-1 at 20; ECF No. 159 at ¶ 101.)  It is not clear to the Court, however, that SMS's decision to feature Onyando and Pearsall in its bid constitutes "indirect" solicitation in violation of the non-interference provision, particularly considering the sixth subsection of that provision, which states that

> [t]he restrictions contained in this Agreement are not intended to, and shall not be interpreted to, completely bar Employee from working for a competitor . . . . Rather, the restraints are intended to reasonably limit Employee from engaging in conduct involving a risk of use of Confidential Information in direct competition with GCA[.]

This language allows for a former GCA employee to work for a competitor, and, in so doing, "indirectly" solicit clients, as long as those clients are not among the types described in the non-interference provision.  The fact that SMS "[won] the Cheatham County contract away from GCA" (ECF No. 152-1 at 20) does not place Cheatham County in one of the discrete categories

of customers outlined by the non-interference provision, and Plaintiff offers no definitive evidence on this issue.

Finally, Plaintiff also alleges that Pearsall breached his non-interference agreement by soliciting Gibson County School District, "then a GCA customer," in August 2016 (ECF No. 152-1 at 20), but again this is insufficient to establish that Gibson County was either a GCA client generally between May 2014 and May 2015, as required by the first subsection, or a client that Pearsall personally serviced during his time at GCA, as required by the second subsection.

*   *   *

Given the facts before the Court, there is no genuine dispute of material fact regarding Parker and Onyando's breach of the non-competition provisions in their employment agreements, and no dispute as to Pearsall's breach, if his contract is valid.  In addition, there is no genuine dispute of material fact regarding Coulter and Onyando's breach of their non-interference provisions in connection with their solicitation of the Millington Municipal Schools. However, there remain disputes of fact as to whether Defendants' solicitation of Shelby County Schools, Cheatham County Schools, and Gibson County School District fall within the range of conduct prohibited by the non-interference provision.

### 4.  Damage or Loss as a Result of Breach

Finally, Defendants argue that Plaintiff has not established any <u>actual</u> injuries brought about by Parker and Coulter's breach of their employment agreements.  "Plaintiff has acknowledged that it has not lost any contracts with any school districts as a result of any acts or omissions by Coulter and Parker" (ECF No. 149-1 at 14), which Defendants contend defeats the element of "damage or loss as a result of breach," as the Northern District of Ohio put it.

MP TotalCare, 648 F. Supp. 2d at 962.  In the absence of this "essential element," summary judgment in favor of Defendants would be appropriate.  Doner, 649 N.E.2d at 44–45.

Unlike tort claims, however, actual damages are not, "strictly speaking," required to recover on a breach of contract claim.  DeCastro v. Wellston City Sch. Dist. Bd. of Edu., 761 N.E.2d 612, 615 (Ohio 2002) (holding that "nominal damages can be recovered where actual monetary damages cannot be proven in a breach of contract claim");[17] see also 11 Williston on Contracts § 1339A (3d ed. 1968) ("An unexcused failure to perform a contract is a legal wrong. Action will lie for breach although it causes no injury.").  Particularly where a plaintiff requests injunctive relief "to prevent a future wrong that the law cannot," no other proof of damage is needed.  Garano v. State, 524 N.E.2d 496, 498 (Ohio 1988).  Making actual injury a prerequisite to an award of injunctive relief would require a plaintiff to wait until she had actually been injured, which the law does not require.  Requiring a showing of actual injury may also render other bargained-for contract provisions meaningless.  In this case, Defendants who allegedly violated the restrictive covenants in their employment agreements would be able to escape GCA's contract damages clause, essentially because their offending ventures were not too successful.

Still, Plaintiff's recovery of damages depends on establishing either contract or actual damages.  The damages section of GCA's employment agreement states that

---

[17]   The DeCastro Court also held that

> summary judgment may be granted to the defendant in a breach-of-contract case where the plaintiff has failed to provide evidence of economic damages resulting from a breach of contract and has failed to seek injunctive relief or specific performance of a contractual duty, but instead rests his or her right to proceed to trial solely on a claim for nominal damages.

DeCastro, 761 N.E.2d at 617 (emphasis added).  This is not the status of the case at bar, given Plaintiff's pursuit of more than nominal damages and injunctive relief.

> Employee . . . agrees that if he/she shall violate any of the agreements under
> Sections 1 and 2, GCA shall be entitled to an accounting and repayment of all
> profits, compensation, commissions, remunerations or other benefits which
> Employee directly or indirectly realizes . . . growing out of or in connection with
> any such violation.  This remedy shall be in addition to and not in limitation of
> any injunctive relief . . . to which GCA . . . may be entitled under this Agreement,
> or at law or in equity.

In Coulter's agreement, Section 1 is his non-disclosure provision, and Section 2 is his non-interference provision.  In Parker, Onyando, and Pearsall's agreements, Section 1 is their non-disclosure provision, Section 2 is their non-competition provision, and Section 3 has become their non-interference provision.  Interestingly, then, the damages section of these agreements only covers the non-interference violations in Coulter's case.  Though the non-interference provision became Section 3 in the latter agreements, the language of the damages section was never amended to include Section 3.

Plaintiff contends that, under the damages provision, it is entitled to "monetary damages as measured by the compensation that each received during their employment by competitors." (ECF No. 152-1 at 28.)  According to Plaintiff, this amounts to $40,600.00 against Parker, $42,750.00 against Coulter, $42,149.88 against Onyando, and $85,149.97 against Pearsall.  (Id.) Parker and Coulter do not dispute that they earned this amount through their "ownership of and employment by ParCou" in 2015 and 2016.  (ECF No. 159 at ¶¶ 107–08.)  Onyando has not disputed that he earned this amount through his employment with SMS.  Pearsall disputes that he earned $85,149.97, but does not point to evidence to support his assertion.  (ECF No. 173.)

Plaintiff is entitled to recover the amounts cited above against Parker and Onyando, whose breaches of their respective non-competition provisions have been established as a matter of law.  Plaintiff is also entitled to recover Coulter's compensation from ParCou, because his breach of the non-interference provision in his contract has also been established as a matter of

law.[18]   However, Plaintiff is not entitled to summary judgment as to this recovery from Pearsall.

Pearsall has denied that the amount in the Plaintiff's Statement of Undisputed Facts is accurate,

and, again, although the assertions in his letter cannot be taken as fact, Plaintiff has not produced

overwhelming evidence to support its accounting.   The amount that Pearsall earned for the

period between July 2015 and May 2016 could not be ascertained at Pearsall's deposition, and

counsel could only confirm that Pearsall received $30,149.97 ($23,711.73 after taxes) from

June 2016 to January 2017, and $1,800 in severance.   (ECF No. 152 at 33–36.)   Therefore, this

issue is one for the jury.

Plaintiff also claims that it is entitled to injunctive relief.   Although the relevant

restrictive periods in each contract have long since expired, Plaintiff argues that Ohio law

empowers a trial court "to grant injunctive relief, if appropriate, for the period of time to which

[the plaintiff] is entitled."   (ECF No. 152-1 at 2 (citing Raimonde, 325 N.E.2d at 549).)   Given

that Plaintiff will recover "the compensation that each received during their employment by

competitors," the Court finds that injunctive relief is not appropriate in this case with respect to

Parker, Coulter, and Onyando, insofar as the Defendants' compensation during the period of

breach is sufficient to account for the benefit that GCA would have otherwise been entitled.

Compare Penzone, Inc. v. Koster, No. 07AP-569, 2008 WL 256547 (Ohio Ct. App. Jan. 31,

2008) (decision of lower court reversed, because "[Plaintiff] [had] not had the benefit of the full

eight months in which it could make efforts to retain clients").   Id. at *5.   If Plaintiff can

demonstrate that the monetary damages it recovers are insufficient to account for the two-year

---

[18]      Plaintiff is not entitled to summary judgment against Onyando on the theory that he breached the
non-interference provision of his employment agreement because the damages provision in Onyando's
agreement does not entitle Plaintiff to recover for breaches of the non-interference provision.   See supra.
Plaintiff would only be entitled to recover under this theory through evidence presented at trial that
demonstrates damages caused by Onyando's interference with the Millington Municipal Schools.

restrictive period to which it was entitled in each Defendants' case, the Court will consider imposing a commensurate period of injunctive relief.

*       *       *

The Court finds, as a matter of law, that the restrictive covenants in Defendants' employment agreements are valid. Even if the Court were persuaded that these covenants were overly broad, the proper course of action would be to modify them—resulting in a valid contract that Defendants' competition and interference violated. The Court also finds, however, that a genuine dispute of material fact exists concerning whether Pearsall in fact signed his agreement, rendering judgment as a matter of law with respect to Claim I improper. Plaintiff's motion for summary judgment on Claim I is therefore **DENIED**.

The Court also finds that Plaintiff did not first materially breach Parker's employment contract. Defendant Parker's motion for summary judgment on Claim IV on this basis is therefore **DENIED**.

With respect to establishing breach, the Court finds that there is no genuine dispute of material fact regarding Parker and Onyando's breach of their respective non-competition provisions (and none as to Pearsall, if the jury finds that a valid contract exists), and no genuine dispute of material fact regarding Coulter and Onyando's breach of their respective non-interference provisions in connection with their solicitation of the Millington Municipal Schools. Judgment as a matter of law is appropriate, and therefore summary judgment is **GRANTED IN PART** as to Defendants Parker, Coulter, and Onyando's liability for breach of contract.

Finally, the Court finds that there is no genuine dispute of material fact regarding the amount of monetary damages to which Plaintiff is entitled under the damages provision for Parker, Coulter, and Onyando's respective breaches. Plaintiff is entitled to an accounting of the

compensation which Parker, Coulter, and Onyando realized "as a result of, growing out of, or in connection with" their employment with competitors, and Defendants do not dispute the amounts Plaintiff attributes to that employment.  The Court reserves judgment regarding whether these amounts adequately account for the restrictive periods to which GCA was entitled under the employment agreements.

### B.  Tennessee Uniform Trade Secrets Act ("TUTSA") Claim (Count XI)

Defendants Parker and Coulter argue that they are entitled to summary judgment on Plaintiff's TUTSA claim because Plaintiff cannot show that Defendants used the purported trade secrets.  (ECF No. 149 at 2.)  Nor, argue Defendants, can GCA demonstrate that it was harmed by any alleged use of those trade secrets.  (Id.)  Plaintiff responds that "neither is an element of a TUTSA claim." (ECF No. 155 at *16.)

Plaintiff is correct—"proving misappropriation [under TUTSA] requires only evidence of acquisition by improper means."  Williams-Sonoma Direct, Inc. v. Arhaus, LLC, 109 F. Supp. 3d 1009, 1018 (W.D. Tenn. 2015).  By its very terms,  "misappropriation" means "acquisition . . . or . . . use."  T.C.A. § 47-25-1702 (2)(A)–(B) (emphasis added).  Furthermore, as the statute makes clear, "[a]ctual or threatened [use] may be enjoined," including in order to "[eliminate] the commercial advantage that otherwise would be derived from the misappropriation."  T.C.A. § 47-25-1703(a).  This interpretation is further buttressed by the statutory language that states that a TUTSA complainant may be entitled to recover damages that "can include . . . actual loss . . . and the unjust enrichment caused by misappropriation."  Id. at § 1704(b).  The use of the word "can" implies that the complainant may—but need not—demonstrate "actual loss."  Thus, TUTSA "does not require proof that the trade secret actually has been used.  Nor does [ ] TUTSA require proof of detriment outside the misappropriation or disclosure itself."  Williams-Sonoma, 109 F. Supp. 3d at 1018.

25

Defendants' reliance on <u>Stratienko v. Cordis Corp.</u>, 429 F.3d 592, 600 (6th Cir. 2005), which sets out the elements of "misappropriation of a trade secret under Tennessee common law[19]—not the TUTSA," <u>Williams-Sonoma</u>, 109 F. Supp. 3d at 1018, is misplaced.  In that case, the common law elements of misappropriation were relevant because the alleged misappropriation had occurred prior to TUTSA's July 2000 effective date.  <u>Id.</u> at 596. Significantly, the threshold for proving misappropriation under TUTSA is much lower than under the common law.  <u>See</u> Douglas F. Halijan, <u>The Past, Present, and Future of Trade Secrets Law in Tennessee: A Practitioner's Guide Following the Enactment of the Uniform Trade Secrets Act</u>, 32 U. Mem. L. Rev. 1, 23–25 (2001) (discussing TUTSA's broader definition of "misappropriation").

Defendants Parker and Coulter also argue that Plaintiff will be unable to show that trade secret information was acquired through "improper means" within the meaning of TUTSA. Despite Defendants' position, the Court is satisfied that a genuine dispute of material fact exists as to Parker and Coulter's acquisition of protected information from GCA, which a reasonable jury could find was effectuated through "breach or inducement of a breach of a duty to maintain secrecy."  T.C.A. § 45-25-1702(1).  <u>See also</u> <u>Hamilton-Ryker Grp., LLC v. Keymon</u>, No. W2008-00936-COA-R3-CV, 2010 WL 323057, at *14 (Tenn. Ct. App. Jan. 28, 2010) (employee acquired information through "improper means" by emailing the information to herself). Therefore, summary judgment for the Defendants is **DENIED** as to Count XI.

---

[19]     These elements were "(1) the existence of a trade secret; (2) communication of the trade secret to the defendant while in a position of trust and confidence; (3) defendant's use of the communicated information; and (4) resulting detriment to the plaintiff."  <u>Stratienko</u>, 429 F.3d at 601.

### C.  Intentional Inducement of Lewis's Breach of Contract (Count XIV)

Defendants ParCou, Parker, and Coulter argue that they are entitled to summary judgment as to GCA's claim that they intentionally induced Jonathan Lewis to breach his employment contract.  To recover for intentional inducement of breach of contract in Tennessee, Plaintiff must establish "that there was a legal contract, of which the wrongdoer was aware, that the wrongdoer maliciously intended to induce a breach, and that[,] as a proximate result of the wrongdoer's actions, a breach occurred that resulted in damages to the plaintiff."  Quality Auto Parts Co. v. Bluff City Buick Co., 876 S.W.2d 818, 822 (Tenn. 1994); Tenn. Code Ann. § 47-50-109.  Defendants argue that they were not aware of Lewis's noncompetition agreement, and that they did not intend to induce a breach.  (ECF No. 148-1 at 6–9; ECF No. 149-1 at 20–23.)

The Court is satisfied, however, that a genuine dispute of material fact exists with respect to the question of Parker and Coulter's knowledge.  Plaintiff points to the fact that Parker was the one who requested Lewis's "new hire packet and employment agreement."  (See ECF No. 155 at *18 (citing ECF No. 156-7 at 3).)  Defendants point out, however, that, when questioned, GCA's Vice President of Operations, Kristopher Thomas, was "unaware if Plaintiff's other employees are subject to noncompetition agreements."  (ECF No. 148-1 at 8 (citing ECF No. 156 at ¶ 35).)  "This is significant," they argue, "because . . . if Plaintiff's vice president of operations is unaware if Plaintiff's employees, including his subordinates, are subject to noncompetition agreements, it is unlikely that lower level managers would be aware of their coworkers' agreements with Plaintiff."  (ECF No. 148-1 at 8).  This dispute creates a genuine issue of fact.

The Court is also satisfied that a genuine dispute of material fact exists with respect to whether Parker and Coulter "intentionally" induced Lewis.  While Parker has testified that he did not intend for Lewis to be involved with ParCou, Lewis received a ParCou email address (ECF

No. 152-12 at 20), was apparently authorized to hold himself out as an executive at ParCou,[20] and received payment from ParCou in 2015 (ECF No. 156-8 at 13–15)—some or all of which may have been calculated to induce Lewis to take actions that may have constituted a breach of his GCA contract.

Defendants also argue—again—that "Plaintiff cannot show that it was damaged by any alleged inducement of breach of contract." (ECF No. 148-1 at 9; ECF No. 149-1 at 23.) Plaintiff counters that it has incurred "legal fees and expenses . . . in enforcing the non-compete against Lewis." (ECF No. 155 at *19.)

"Under Tennessee law, one who through the tort of another has been required to act in the protection of his interests by bringing . . . an action against a third person is entitled to recover reasonable compensation for loss of time, attorney['s] fees and other expenditures thereby suffered or incurred in the earlier action." Edwards Moving & Rigging, Inc. v. Lack, No. 2:14-CV-02100-JPM-tmp, 2015 WL 3891953, *8 (W.D. Tenn. June 24, 2015) (quoting Engstrom v. Mayfield, 195 F. App'x 444, 451 (6th Cir. 2006) (quoting Pullman Standard, Inc. v. Abex Corp., 693 S.W.2d 336, 340 (Tenn. 1985))). Here, Plaintiff would be within its rights to pursue an intentional inducement of breach of contract claim against Defendants ParCou, Parker, and Coulter to recover attorney's fees associated with any litigation against Lewis for breach of contract. Plaintiff would bring a breach of contract claim against Lewis, the argument goes, as a result of Defendants' inducement of that breach. Such a recovery is permitted even where the

---

[20]     Parker denies that Lewis was so authorized, and attributes Lewis's collaboration with Parker and Coulter to Lewis's "madness." (ECF No. 152-6 at 40.) But Parker and Coulter were at the very least constructively aware that Lewis was holding himself out as an executive with GCA (see, e.g., April 20, 2014, email from Lewis to Parker, ECF No. 152-6 at 155 (listing Lewis as "COO"); December 31, 2014 email from Lewis to Smith (cc: Coulter), ECF No. 152-12 at 7 (including "Vice President" in Lewis's ParCou email signature)), and do not appear to have corrected Lewis.

Parties have reached a settlement agreement.  See, e.g., Edwards Moving & Rigging, Inc. v. Lack, No. 2:14-CV-02100-JPM-tmp, ECF No. 46 (W.D. Tenn. filed May 7, 2014).

The Court finds it significant, however, that Plaintiff voluntarily dismissed its claim against Lewis on January 30, 2017.  (ECF No. 115.)   While it is not necessary for Plaintiff to first prevail on a breach of contract claim before bringing a claim for inducement of that breach, the Court is not inclined to allow Plaintiff to pursue the attorney's fees incurred in an abandoned legal suit as the basis for damages in another.  Accordingly, the Court finds that, without proof of damage to Plaintiff,  Defendants are entitled to judgment as a matter of law as to Claim XIV. Defendants' motion is **GRANTED** and Claim XIV is **DISMISSED**.

### D.  Fraud (Count XVII)

Defendants Parker and Coulter also seek summary judgment on Plaintiff's claim that they defrauded GCA when they represented to GCA in 2014 that ParCou was "not formed" and "not competing" with GCA.  To establish a claim for fraud in Tennessee, Plaintiffs must show that

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 311 (Tenn. 2008).  Defendants argue that their statements were "unequivocally true," and again dispute whether GCA can establish any damage as a result of these representations.  (ECF No. 149-1 at 24–25.)  Plaintiff responds that it relied to its detriment on Parker and Coulter's misrepresentations by continuing "to employ and compensate" them (ECF No. 155 at 20), and that it was therefore damaged "in the amount of the compensation it paid [Parker and Coulter] from the time they represented that ParCou was not in business and not competing against GCA, in August 2014, until GCA accepted their resignations on April 20, 2015."  (ECF No. 156 at 17.)

Whether Parker and Coulter's representations to GCA were true or false is a question of fact appropriate for submission to the jury.  When Parker and Coulter began developing work product; ordering marketing materials, business cards and t-shirts; when they set up an email account; when ParCou's website was launched; when ParCou was legally formed; when it established a bank account; when it acquired tax documents and certifications; when it "opened its doors;" when it began soliciting customers and employees; and when it began to realize income—any or all of these considerations might be significant to the fact finder's determination of whether ParCou was "in business" or "competing" when Plaintiff inquired in 2014.

Whether Plaintiff is entitled to recover Defendants' compensation over the period following their allegedly-fraudulent representations is also a question of fact appropriate for submission to a jury.  According to the Restatement (Second) of Torts,

> [o]ne who fraudulently makes a misrepresentation of fact . . . for the purpose of inducing another . . . to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

§ 525 (1977).  See also Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 343–44 (2005) ("[T]he common law has long insisted that a plaintiff in [a deceit or misrepresentation] case show not only that had he known the truth he would [ ] have acted but also that he suffered actual economic loss.").

Plaintiff will be required to demonstrate pecuniary loss caused by its reliance on Parker and Coulter's representations.  Parker and Coulter's compensation over the nine-month period following Plaintiff's investigation may constitute Plaintiff's pecuniary loss.  However, some smaller portion of this total may also be appropriate.  It is up to Plaintiff to present, and Defendants to contradict, how and why this compensation is an appropriate measure of the damages suffered.  Ultimately, the jury will decide whether the facts support this measure of

damages.  There are genuine issues of material fact, and the Court finds that judgment as a matter of law on this issue is inappropriate.  The Court therefore **DENIES** Defendants' motion for summary judgment with respect to this claim.

### E.  Breach of Fiduciary Duty and/or Loyalty (Count XVIII)

Interestingly, in cross-motions for summary judgment, Plaintiff and Defendants both argue that there is no genuine dispute of material fact with respect to Parker and Coulter's alleged breach of fiduciary duty, and both believe that they are entitled to judgment as a matter of law.  Plaintiff argues that Parker and Coulter's actions while employed by GCA—"form[ing] ParCou . . . , using GCA's email and computer equipment, . . . marketing ParCou's services," "soliciting potential customers" and "encourag[ing] other employees to assist them"—constitute an indisputable breach of the duty of loyalty.  (ECF No. 152-1 at *13.)  Defendants contend that their actions were simply and indisputably "arrangements to compete," which do not give rise to a claim of breach of fiduciary duty.  (ECF No. 149-1 at 25.)

Under Tennessee law, all employees owe a duty to "act solely for the benefit of [their] employer in matters within the scope of [their] employment."  Efird v. Clinic of Plastic & Reconstructive Surgery, P.A., 147 S.W.3d 208, 219 (Tenn. Ct. App. 2003); see also Ram Tool, 2014 WL 4102418, at *5.  This includes by refraining from competition with the employer during the employment relationship, even in the absence of a noncompetition agreement, including by not soliciting clients.  Knott's Wholesale Foods, Inc. v. Azbell, No. 01A-01-9510-CH-00459, 1996 WL 697943, at *3 (Tenn. Ct. App. Dec. 6, 1996).  However, "it is not necessary to show that an employee competed with his employer" to establish breach.  Burch v. Gilliam, No. 05-2182 D/P, 2005 WL 2373418, at *3 (W.D. Tenn. Sept. 26, 2005).  An employer must demonstrate "only that the employee took actions adverse to the employer's interest."  Id.

However, as Defendants note (ECF No. 149-1 at 25), the Tennessee Courts have adopted the Restatement (Second) of Agency view that "making arrangements to compete"—so long as the employee does not use the employer's confidential information—does not violate the employee's duty of loyalty to her employer.  Knott's Wholesale, 1996 WL 697943, at *3 (quoting Restatement (Second) of Agency § 393 (1958)); see also Eaves v. Hillard, No. 88-37-II, 1988 WL 49959, at *3 (Tenn. Ct. App. May 18, 1988); Int'l Sec. Mgmt. Group, Inc. v. Sawyer, No. 3:06-CV-0456, 2006 WL 1638537, at *11 (M.D. Tenn. June 6, 2006).  Importantly, while some behaviors clearly constitute a breach of duty, see Knott's Wholesale, 1996 WL 697943, at *5 (direct solicitation of employee's customers in anticipation of future competition while still employed); Ram Tool, 2016 WL 4008718, at *10 (solicitation of coworkers to work for a competitor);[21] Vraney v. Medical Specialty Clinic, P.C., No. W2012-02144-COA-R3-CV, 2013 WL 4806902, at *10 (Tenn. Ct. App. Sept. 9, 2013) (diversion of employer's funds to employee's account), whether an employee has violated her duty of loyalty to her employer will sometimes present a question of fact.  See, e.g., Vraney, 2013 WL 4806902, at *10.

Questions of fact related to this claim make summary judgment inappropriate for any party.  First, Plaintiff has failed to establish an indisputable breach that would make submission to a jury inappropriate.  Plaintiff alleges that Parker and Coulter solicited clients while at GCA.  While there is some evidence in the record that Parker and Coulter drafted a sample proposal (ECF No. 159 at ¶ 49), and even considered which and whether to approach clients during their employment with GCA (ECF. No. 159 at ¶¶ 44, 47, 51, 52, 55), there are genuine issues of

---

[21]     For Defendants' reference, this case demonstrates why "actions taken by other employees of Plaintiff purportedly on behalf of ParCou" may turn out to be a "big deal."  (See ECF No. 158 at 7.)

material fact as to whether Parker and Coulter <u>actually</u> approached any prospective client during their employment.[22]  (ECF No. 158 at 5.)

Plaintiff has also alleged that Parker and Coulter solicited other employees to assist them. (ECF No. 152-1 at *13.)  While there is certainly some circumstantial evidence on this front, particularly with respect to Lewis, Defendants have denied that they solicited Lewis's help, and pointed to the fact that Lewis began working for a different entity when he left GCA to dispute that Lewis ever worked for ParCou.  (ECF No. 156 at ¶ 37.)  The Court does not believe this point is "so one-sided that [Plaintiff] must prevail as a matter of law."  <u>Kroll</u>, 763 F.3d at 623. These questions are for a jury to decide.

The remaining actions that Plaintiff suggests constitute a breach of duty—"using GCA's email and computer equipment" and "marketing ParCou's services" during their employment with GCA—are not so clearly like the circumstances in <u>Knott's Wholesale</u>, <u>Vraney</u>, or <u>Ram Tool</u> that the Court must grant summary judgment for the Plaintiff.  Rather, the Court will leave the fuzzy contours of "loyalty" to the finder of fact.  A dispute of fact also exists with respect to <u>when</u> this alleged breach of loyalty began, which must be determined by a jury to establish the correct amount of damages.  <u>Efird</u>, 147 S.W.3d at 220; <u>Ram Tool</u>, 2016 WL 4008718, at *5. Accordingly, the Court **DENIES** summary judgment to both Plaintiff and Defendants on this Count.

## CONCLUSION

Because Plaintiff admits that there exists no genuine dispute of material fact with respect to Count X and Count XII, the Court **GRANTS** Defendant's motion for summary judgment, and

---

[22]     Meriam-Webster defines "solicit" as "to approach with a request."  [S]olicit, Merrian-Webster.com (Oct. 3, 2017, 8:49 AM), https://www.merriam-webster.com/dictionary/solicit.

those Counts are **DISMISSED WITH PREJUDICE**.  Because there is no genuine issue of material fact as to Parker, Coulter, and Onyando's breaches, and because actual damages are not required to recover on a breach of contract claim, the Court **GRANTS** Plaintiff's motion for summary judgment **IN PART** with respect to Counts III, IV and IX.[23]  Given the genuine disputes of material fact regarding whether a valid contract was formed, and, if so, the appropriate measure of damages in Pearsall's case, the Court **DENIES** Plaintiff's motion for summary judgment on Count I.  Because actual use and proof of damages are not required to establish a TUTSA claim, the Court **DENIES** Defendant's motion for summary judgment with respect to Count XI.  Because attorney's fees in a voluntarily dismissed action against a third-party are insufficient to establish damages for intentional inducement of breach of contract, the Court **GRANTS** Defendants' motion with respect to Count XIV, and that claim is **DISMISSED**. And because genuine disputes of material fact exist regarding whether Defendants Parker and Coulter defrauded or breached their duty of loyalty to Plaintiff, the Court **DENIES** summary judgment to Defendants on Count XVII and to both Plaintiff and Defendants' on Count XVIII.

        As set out in the table attached to this Order, the only claims that remain for trial are Count I, breach of contract against Pearsall; Count XI, violation of TUTSA against Parker, Coulter, Onyando, and Pearsall;  Count XIII, intentional interference with business relationships against Pearsall;[24] Count XVII, fraud against Parker and Coulter; and Count XVIII, breach of fiduciary duty and/or loyalty against Parker and Coulter.

---

[23]        The issue of injunctive relief remains to be determined.  Defendants' motions for summary judgment as to Counts IV and IX are **DENIED**.

[24]        Subject to briefing prior to trial.  _See_ _supra_ at n.13.

**IT IS SO ORDERED**, this 3rd day of October, 2017.


s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE

| *Remaining claims appear in bold.* | **DEFENDANT(S)** | **DISPOSITION** |
|---|---|---|
| **I–IX.   Breach of Contract** | **Christopher Pearsall** | *Pending before the Court* |
| | David Coulter | Dismissed by motion Nov. 28, 2016 (ECF No. 106) |
| | Collins Onyando | **PARTIAL SUMMARY JUDGMENT GRANTED FOR PLAINTIFF** |
| | Jerry Parker | **PARTIAL SUMMARY JUDGMENT GRANTED FOR PLAINTIFF** |
| | Enzo Dickens | Dismissed by motion Nov. 28, 2016 (ECF No. 106) |
| | Jerry Tigner | Voluntarily dismissed Oct. 24, 2016 (ECF No. 98) |
| | Jonathan Lewis | Dismissed by motion Jan. 30, 2017 (ECF No. 115) |
| | LaKendrell Parker | Dismissed by motion Mar. 20, 2017 (ECF No. 132) |
| | Mark Coulter | **PARTIAL SUMMARY JUDGMENT GRANTED FOR PLAINTIFF** |
| X.   Misappropriation under Tennessee Common Law | Christopher Pearsall | **DISMISSED** |
| | David Coulter | Dismissed by motion Nov. 28, 2016 (ECF No. 106) |
| | Collins Onyando | **DISMISSED** |
| | Jerry Parker | **DISMISSED** |
| | Enzo Dickens | Dismissed by motion Nov. 28, 2016 (ECF No. 106) |
| | Jerry Tigner | Voluntarily dismissed Oct. 24, 2016 (ECF No. 98) |
| | Jonathan Lewis | Dismissed by motion Jan. 30, 2017 (ECF No. 115) |
| | LaKendrell Parker | Dismissed by motion Mar. 20, 2017 (ECF No. 132) |
| | Mark Coulter | **DISMISSED** |

| XI. Violation of Tennessee Uniform Trade Secrets Act | Christopher Pearsall | *Pending before the Court* |
|---|---|---|
| | David Coulter | Dismissed by motion Nov. 28, 2016 (ECF No. 106) |
| | **Collins Onyando** | *Pending before the Court* |
| | **Jerry Parker** | *Pending before the Court* |
| | Enzo Dickens | Dismissed by motion Nov. 28, 2016 (ECF No. 106) |
| | Jerry Tigner | Voluntarily dismissed Oct. 24, 2016 (ECF No. 98) |
| | Jonathan Lewis | Dismissed by motion Jan. 30, 2017 (ECF No. 115) |
| | LaKendrell Parker | Dismissed by motion Mar. 20, 2017 (ECF No. 132) |
| | **Mark Coulter** | *Pending before the Court* |
| XII. Intentional Interference with Business Relationships | David Coulter | Dismissed by motion Nov. 28, 2016 (ECF No. 106) |
| | Jonathan Lewis | Dismissed by motion Jan. 30, 2017 (ECF No. 115) |
| | LaKendrell Parker | Dismissed by motion Mar. 20, 2017 (ECF No. 132) |
| | Jerry Parker | **DISMISSED** |
| | Jerry Tigner | Voluntarily dismissed Oct. 24, 2016 (ECF No. 98) |
| | Enzo Dickens | Dismissed by motion Nov. 28, 2016 (ECF No. 106) |
| XIII. **Intentional Interference with Business Relationships** | Southern Maintenance Systems | Default judgment entered Aug. 8, 2017 (ECF No. 171) |
| | **Christopher Pearsall** | *Subject to dismissal prior to trial* |
| XIV. Intentional Inducement of Breach of Contract | Jerry Parker | **DISMISSED** |
| | Mark Coulter | **DISMISSED** |
| | ParCou | **DISMISSED** |

| XV. | Intentional Inducement of Breach of Contract | Southern Maintenance Systems | Default judgment entered Aug. 8, 2017 (ECF No. 171) |
|---|---|---|---|
| XVI. | Defamation | David Coulter | Dismissed by motion Nov. 28, 2016 (ECF No. 106) |
| **XVII.** | **Fraud** | **Jerry Parker** | *Pending before the Court* |
| | | **Mark Coulter** | *Pending before the Court* |
| **XVIII.** | **Breach of Fiduciary Duty and/or Loyalty** | **Jerry Parker** | *Pending before the Court* |
| | | **Mark Coulter** | *Pending before the Court* |
| XIX. | Breach of Fiduciary Duty and/or Loyalty | David Coulter | Dismissed by motion Nov. 28, 2016 (ECF No. 106) |

iii